WO

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Nannette Fawn Anderson, | No. CV-15-00428-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Life Insurance Company of North America, | |
| Defendant. | |

Plaintiff Nannette Anderson ("Anderson") brings this action to obtain both short term and long term disability benefits under her policy with Defendant Life Insurance Company of North America ("LINA"). The parties filed trial briefs seeking the Court's decision on the administrative record. (Docs. 27, 28.) After reviewing the administrative record and applicable law, the Court determines that Anderson fails to meet her burden of proof that she was not able to do sedentary work over the relevant time period and is thus not entitled to either short term or long term disability benefits.

**FINDINGS OF FACT**

**I.    Anderson's Position at HUB International Limited**

HUB International Limited ("HUB") hired Anderson as an account manager on May 1, 2012. (1, 3, 605.)[1] Anderson's essential duties as an account manager according to HUB's job description included working "closely with . . . HUB personnel on all

---

[1] Unless a different prefix is included, all record citations are referring to the LINAACL prefix filed as part of the administrative record. (Doc. 26.)

aspects of client service[ and] marketing," handling all "preparation and implementation" of assigned accounts, understanding clients' insurance objectives, staying "abreast of changes in the insurance industry," resolving service issues, as well as maintaining one's current book of business while also developing new business.  (605.)  The physical requirements of her position as explained in HUB's job description included being "regularly required to sit; use hands to finger, handle, or feel and talk or hear . . . occasionally lift and/or move up to 10 pounds . . . [as well as] vision abilities . . . [like] close vision and ability to adjust focus."  (607.)

As a benefit of employment, Anderson participated in HUB's group insurance policy ("Plan").  (*See* 1; LINAASTD000006.)  The Plan was funded by LINA policies.  (LINAASTD000006; LINAAPOL000013.)   LINA processed claims and made benefit determinations under the Plan.  (LINAASTD000006; LINAAPOL000013.)   The Plan provided short term disability ("STD") and long term disability ("LTD") insurance coverage.  (LINAASTD000011; LINAAPOL000019.)   The Plan was governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001, *et seq.*  (Docs. 27 at 2, 28 at 16.)

## II.   LINA Denies Anderson's Initial STD Claim and Affirms Its Decision on Appeal

At the time Anderson began working for HUB she was in good health and led an active lifestyle which included hiking and traveling.  (998.)  In January 2013 she began to experience "terrible, debilitating" headaches as well as severe neck pain.  (998.)  Starting in February 2013, she experienced problems with her speech, memory, and concentration.  (998.)   And around the same time, Anderson began having trouble maintaining her balance and walking.  (998.)  Over the month of February, her neck pain increased while new issues of back pain and "extreme fatigue" began.  (999.)

Anderson first addressed these symptoms in February 2013 when she visited Dr. Drew Durbin, her family doctor, and complained of "upper back pain."  (1155–56.)  Dr. Durbin noted that Anderson had endured "several weeks of constant pain in the mid back

region, and . . . the neck." (1055.)  Dr. Durbin ordered x-rays of Anderson's "cervical and thoracic spine[,]" and deferred any treatment until the x-ray results came back. (1056.)  The cervical x-ray revealed moderate-to-severe "lower cervical degenerative disc space narrowing," while the thoracic x-rays revealed "minimal thoracic levocurvature and degenerative change." (722–23.)  On March 5, 2013, Anderson followed up with Dr. Durbin who noted that Anderson's neck and back pain had continued since her last visit and she now experienced severe diffuse headaches. (1056.)  Anderson also reported numbness in her right arm and issues with her voice, concentration, and memory. (1056.) Dr. Durbin referred Anderson for an MRI/CT scan of her brain, and cervical and thoracic spine. (1057.)  On March 11, 2013, the results from the CT scan of Anderson's cervical spine showed "mild to moderate central canal narrowing," and "neural foraminal stenosis . . . due to asymmetric . . . uncovertebral spurring and facet hypertrophy." (784–85.)  The CT scan of her thoracic spine revealed "broad-based disc protrusions" that "contribute to at least mild narrowing of the central canal." (787–88.)  The CT scan of Anderson's brain revealed no abnormalities. (786.)

On March 19, 2013, Dr. Paul Gause of the Spine Institute of Arizona examined Anderson. (753–55.)  During the visit, Anderson complained of headaches as well as neck, back, arm, and leg pain. (753.)  Dr. Gause, analyzing the CT scans of Anderson's cervical and thoracic spine, opined that "she does have some degenerative disc disease." (755.)  After examining Anderson's cervical spine, Dr. Gause noted that except for some tenderness over certain muscles in the cervical spine, palpation seemed normal, while Anderson expressed pain with range of motion although her range of motion was full. (754.)  Anderson's chief complaint was neck pain, and Dr. Gause concluded that her other symptoms like arm pain and headaches were not likely connected to her neck pain. (755.)  Dr. Gause recommended she see an ear, nose, and throat ("ENT") specialist as well as a neurologist and instructed her to begin physical therapy. (755.)

On March 21, 2013, Dr. Christopher Lykins, an ENT specialist, wrote a letter to Dr. Durbin and Dr. Gause regarding his examination of Anderson. (773–74, 875.)  Dr.

Lykins focused on Anderson's complaints of throat, mouth, and facial numbness as well as the persistent hoarseness of her voice. (773.)  After examining Anderson, Dr. Lykins noted that Anderson did have decreased sensation in her larynx, but ultimately determined that she was "complaining of neurologic symptoms that extend beyond the contributions" of her "cervical spine," and recommended an MRI of her brain. (773.)  Dr. Lykins also opined that Anderson's hoarseness may be the "sequela" of her ongoing neurological issues; however, he did not believe the same for her symptoms of facial numbness and headaches. (774.)

Anderson's last day at HUB was March 26, 2013. (219.)  On April 1, 2013, Anderson first contacted LINA to initiate her short term disability ("STD") claim. (212.)  During that initial contact, LINA noted that Anderson complained of "having severe difficulty getting up and walking . . . numbness in back of neck and difficulty swallowing." (212.)

Upon referral from Dr. Durbin, Anderson next saw Dr. Nida Laurin, a neurologist, on April 1, 2013. (870.)  Anderson presented Dr. Laurin with a litany of symptoms including cognitive impediments, numbness throughout her body, trouble balancing, fatigue, and back pain. (870.)  After examining Anderson, however, Dr. Laurin determined that while she does have "degenerative spine disease with some mild canal narrowing," her neurological examination was otherwise "completely normal." (871.)

On April 5, 2013, Anderson underwent an MRI of her brain at the instruction of Dr. Lykins. (782.)  The imaging company distributed the radiology report to Dr. Lykins, Dr. Durbin, Dr. Laurin, and Dr. Gause. (782.)  The report noted no abnormalities. (782.)

Anderson admitted herself to the Mayo Clinic on April 16, 2013. (701.)  Anderson complained primarily of shortness of breath, chest pain, and difficulty talking, but she also complained of migratory pain, generalized numbness throughout her body, mental fogginess, decreased memory and concentration, and trouble walking. (689, 694.)  As a result of her chest pain, the clinic admitted her for observation. (702.)  Anderson underwent various cardiac tests which cleared her of any cardiac issues. (689, 696.)

1    However, during her stay at the clinic, her migratory pain and numbness intensified

2    causing the clinic to consult Dr. Amelia Adcock, a neurologist.  (689.)

3        In her April 18, 2013 report, Dr. Adcock outlined Anderson's previous care, and

4    marked down that Anderson did not follow up with her previous neurologists "because

5    she felt they were dismissive of her symptoms."  (690.)  Dr. Adcock examined Anderson,

6    and noted that she complained of a headache with "7/10 [pain], although she appears in

7    no acute distress."  (691.)  Dr. Adcock further explained that Anderson seemed "to have

8    no difficulty with recall," and "cogently describe[d] her medical history."  (691.)  After

9    completing her examination, Dr. Adcock described Anderson as someone with

10   "migratory multifocal complaints and history of untreated fibromyalgia with essentially

11   normal neurologic exam."  (691.)  Dr. Adcock added that she did "not believe [Anderson]

12   has any serious chronic neurologic condition" since "[h]er exam and clinical history are

13   not consistent with [such a condition]."  (691.)  In conclusion, Dr. Adcock recommended

14   that as to Anderson's cognitive complaints she undergo "outpatient neuropsych testing

15   with personality profile" in order to "prov[e] to [her that] her cognition is normal[.]"

16   (692.)  Finally, Dr. Adcock prescribed pain medication for Anderson's headaches, but

17   otherwise attributed her hoarseness and migratory paresthesias to her "clinical syndrome"

18   since at least the hoarseness is "likely nonphysiologic in nature."  (692.)

19       Anderson remained at the Mayo Clinic until April 19, 2013, on which her

20   attending physician, Dr. Jason Vance, drafted a hospital discharge summary that included

21   a principal diagnosis of "intractable back pain with chronic pain syndrome."  (693.)  Dr.

22   Vance also reported a long list of secondary diagnoses.  (*See* 693–94.)  As to Anderson's

23   pain, while under Dr. Vance's care she was scheduled to undergo a stress test, but Dr.

24   Vance postponed the test due to Anderson's "acutely worsening pain."  (694.)  Dr. Vance

25   then adjusted her pain meds until her pain subsided.  (694.)  Dr. Vance also noted that

26   generalized numbness persisted throughout Anderson's time at the clinic; however, she

27   "remained neurologically intact with full strength of bilateral upper and lower extremities

28   on clinical exam."  (695.)  As to Anderson's history of falls, Dr. Vance observed that she

"worked with physical therapy, but required minimal assist." (695.) Dr. Vance also started Anderson on a trial of Cymbalta for her headaches and pain. (692, 697.) Finally, Dr. Vance ordered a speech evaluation to help diagnose Anderson's issues with hoarseness, which returned normal results. (724.)

On April 18, 2013, Dr. Lykins completed a Medical Request Form evaluating Anderson's disability claim as to her dysphonia, *i.e.*, difficulty speaking. (875.) Dr. Lykins wrote "none" when asked to state whether dysphonia caused any work related restrictions. (875.)

On April 29, 2013, Anderson followed-up with Dr. Durbin who "told [her] the present available evidence is not consistent with a degenerative process," and therefore if she wanted to pursue disability benefits, she "should gather all medical information/evaluation to date to be presented to an examiner who is trained to determine candidacy for disability." (1061.)

Anderson met with Dr. Seth Kaufman, a neurologist, on May 9, 2013. (479.) Anderson presented a complaint of numbness, pain in her back and neck, headaches, and problems with memory, walking, and talking. (479.) Dr. Kaufman examined Anderson, and observed her speech to be "hypophonic and has decreased fluency," but with "[n]ormal naming and repetition." (482.) Otherwise, Dr. Kaufman ordered up a litany of tests and laboratory studies related to Anderson's other symptoms. (479–83.) Anderson returned to Dr. Kaufman on June 19, 2013 for a follow up appointment. (474.) She expressed that her symptoms had remained the same since her May visit. (474.) While Dr. Kaufman started Anderson on a new drug for her headaches and noted her degenerative disc issues, Dr. Kaufman made no other abnormal observations. (477.) He ordered a follow-up in 6–8 weeks. (477.) On July 18, 2013, Anderson returned and reported no improvement in her headaches, speech, or cognitive issues. (468.) Dr. Kaufman ordered a DaT scan in order to rule out the possibility of a Parkinson's Disorder. (472.) Anderson followed-up with Dr. Kaufman for the final time on October 18, 2013, where again, she reported unchanged symptoms except with greater

occurrences of lightheadedness.  (463.)  Dr. Kaufman reported that Anderson's cognitive testing showed "mild changes but no evidence of dementia."  (463.)  However, Anderson's neuropsychological assessment "revealed slowed speed of information processing[,] [m]ild impairment of verbal learning and memory[, and] [c]ognitive issues felt to be multifactorial in setting of chronic pain, depression, sleep disturbance."  (466.) Otherwise, all other tests and studies produced normal results.  (466.)

Around June 6, 2013, Dr. Scott Taylor, board certified in occupational and preventive medicine, and employed by LINA, reviewed Anderson's submitted medical records and in a preliminary report found that they failed to provide "documentation of physical or cognitive functional deficits by clinically measurable testing to support [Anderson's] inability to perform work activities from 03/26/13 forward."  (183.) Nevertheless, Dr. Taylor recommended Anderson be subject to certain restrictions "due to reported unsteadiness" like no climbing, no working at heights, and "no working around/with moving machinery/vehicles."  (183.)

Based on Dr. Taylor's determination, LINA officially denied Anderson's STD claim on June 6, 2013.  (394.)  A short term disability manager, nurse care manager, medical director, and a senior claim manager reviewed Anderson's file.  (395.)  The denial detailed what information LINA considered in its review, which included all of the testing and examinations Anderson underwent from March 11, 2013 until May 15, 2013. (395.)  LINA summarized the relevant findings and concluded that despite some limitations or restrictions due to her condition, "[t]here was no definite evidence in the medical records that [Anderson] received restrictions or were removed from work activities by [her] treating physicians."  (397.)  Accordingly, without "other documentation, the medical records reviewed d[id] not provide documentation of physical or cognitive functional deficits by clinically measureable testing to support [Anderson's] inability to perform work activities from March 26, 2013 to present." (397.)  On June 17, 2013, Anderson appealed LINA's STD denial.  (814.)

/ / /

In May 2013, Dr. Chad Campbell took over as Anderson's family doctor/primary care physician. (519.) Dr. Campbell examined Anderson at least seven times between May 14, 2013 and December 6, 2013. (508, 510, 511, 513, 515, 517, 519.) In May 2013, Dr. Campbell assessed Anderson and noted that her primary ailment was what he described as "unspecified hereditary and idiopathic peripheral neuropathy." (519, 517, 515, 513.) In his progress notes after Anderson's third visit on June 24, 2013, Dr. Campbell noted "disability" as the reason for the appointment, and then expressed his treatment recommendations for Anderson's peripheral neuropathy, which included amongst other things: "No working. . . ." (515.) Starting with Anderson's July 3, 2013 appointment, Dr. Campbell made similar notes related to the reason for Anderson's visit, like Anderson "comes in to discuss FMLA [Family and Medical Leave Act] and plan." (513.) Related notes appear in Anderson's July 22 and August 27, 2013 progress notes as well. (511, 510 ("needs to get paper work ready for disability").) In late July, Dr. Campbell began listing headaches as Anderson's primary ailment and not peripheral neuropathy. (511.)

At Anderson's request, Dr. Campbell wrote a letter dated May 28, 2013 outlining Anderson's symptoms and ultimately concluding that "Anderson cannot perform her job functions, nor could she perform a job of minimal or less demand." (639.) Anderson included the letter as part of her STD appeal. (634.)

Dr. Campbell also wrote a subsequent letter on July 23, 2013 that LINA accounted for in its STD appeal review, which stated that Anderson "ha[d] been diagnosed with chronic migraines, fibromyalgia, degenerative disc disease, spinal stenosis, and an unknown neurologic degenerative disorder which still needs further testing . . . ." (615.) Dr. Campbell concluded that Anderson suffers from various ailments that render her "unable to work in any fashion . . . ." (615.) He further stated that Anderson's "symptoms started 3/26/15 and have unfortunately not [stopped]." (616.) Dr. Campbell also expressed his hope that eventually she "will gain a lot of her function back and be able to return to work." (616.) The letter ultimately requested LINA to "look over the

situation again and reconsider [its] decision as the frustrations of trying to get this approved do nothing but add to the stress of a patient who needs every ounce of her energy to work on getting a diagnosis and getting better." (616.)

Dr. Kaufman referred Anderson to Dr. Jeannine Morrone-Strupinsky, a neuropsychologist, for a neuropsychological "evaluation to obtain a quantitative assessment of [Anderson's] current level of neurocognitive functioning," and to assist with diagnosis and treatment. (534.) During the five-hour appointment on July 15, 2013, Anderson underwent extensive neuropsychological testing. (535–36.) Dr. Morrone-Strupinsky also evaluated Anderson's intellectual functioning by calculating her Full Scale IQ and concluding that she performed in the average range in intellectual functioning, core verbal, and core performance abilities. (536.) Dr. Morrone-Strupinsky's final impressions stated that Anderson "demonstrated slowed speed of information processing, . . . [v]erbal learning and memory were mildly impaired, where visuospatial learning and memory were average. . . . [F]ine manual dexterity was borderline impaired. Results otherwise were within normal limits." (537–38.) The "origin of [Anderson's] cognitive issues likely is multifactorial. Chronic pain, depression, and sleep disturbance can reduce cognitive efficiency." (538.) Dr. Morrone-Strupinsky recommended that Anderson implement helpful strategies like a day-planner to "circumvent [her] cognitive lapses," and suggested that she could benefit from "mindfulness meditation for pain management and improved concentration." (538.)

Upon a referral from Dr. Adcock, Dr. Dona Locke saw Anderson on July 31, 2013 and conducted a neuropsychometric evaluation. (681.) Dr. Locke's evaluation tested Anderson's "premorbid baseline," language, attention/concentration, visuospatial, memory, speed, and personality. (683–84.) Anderson fell into the lower average or impaired range on language, attention/concentration, memory, and speed. (683–84.) Dr. Locke opined that Anderson had an abnormal cognitive profile "primarily due to impairment in executive functioning and memory[;]" however, Dr. Locke cautioned that Anderson's scores may overestimate her cognitive difficulties since she was unable to

fully engage in all testing due to fatigue and reduced stamina. (684.) Notably, Anderson, for the first time on record, utilized a wheelchair and a walker. (682.)

On September 30, 2013, LINA affirmed its denial of Anderson's STD claim. (378.) LINA assessed in its evaluation additional evidence that spanned from November 3, 2012 to August 1, 2013. (379.) Both an appeal nurse claim manager and an appeals senior associate reviewed Anderson's file. (379.) Ultimately, LINA found that the medical evidence did not support "a degree of functional loss present and of a severity to continuously preclude" Anderson from performing her duties as an account manager starting on March 26, 2013. (380.)

On January 2, 2014, Olga Reupert, the vice-president of benefits and compensation at HUB, contacted LINA with an inquiry regarding LINA's denial of Anderson's benefits claim. (613.) Ms. Reupert sought to "understand the basis of the denial," and requested that LINA review Anderson's claim once more. (613.) Ms. Reupert noted that it was "unusual that a person with this much medical support could be denied." (613.) Her email also included a copy of Dr. Campbell's July 23, 2013 letter as well as a letter from Dr. Kaufman in support of finding Anderson disabled. (615–17.) In the short September 5, 2013 letter that Ms. Reupert first introduced to LINA in her January 2014 correspondence, Dr. Kaufman asked LINA to "reconsider [its] decision to deny [Anderson] disability benefits." (617.)

III. **LINA Denies Anderson's Initial LTD Claim and Affirms Its Decision on Appeal**

After LINA denied her STD claim, Anderson retained counsel who, on January 31, 2014, contacted LINA and requested a long term disability ("LTD") claim form. (523.) Around the same time, Anderson moved from Arizona to Missouri. (74.)

HUB's LTD claim employs a pre-existing condition exclusion if the claimant has been covered for less than a year. (LINAAPOL000028.) Anderson's disability commenced on March 26, 2013, within a year of her effective date of coverage, June 1 , 2012, thus the pre-existing condition exclusion potentially applied. (212;

LINAAPOL000028.)   A condition is pre-existing if the claimant incurred expenses or sought treatment, care, or services for it during the three-month period preceding the claimant's effective date.  (266.)   Accordingly, LINA wrote Anderson on February 6, 2014 and requested medical records covering the period from March 1, 2012 to May 31, 2012.  (266.)   LINA explained that if it did not receive the requested information by March 10, 2014, it would render a decision on Anderson's LTD claim based on the "information on file."  (266.)   Anderson's counsel successfully obtained some of the relevant records, however, counsel could not track down all of the pertinent documents requested by LINA by the deadline.  (1031, 1094–95.)

On March 10, 2014, LINA denied Anderson's LTD claim because it "did not receive information from Dr. Gause, Dr. Hessler and Dr. Lykins for the time period of March 1, 2012 through May 31, 2012, and, as such, w[as] unable to determine if" the pre-existing condition exclusion barred Anderson's LTD claim.  (246–47.)

In a May 28, 2014 letter, Anderson's counsel appealed LINA's denial of LTD coverage, provided LINA's desired 2012 medical records covering the pre-existing condition period, and attached additional documents in support of a disability finding. (931–34.)   The additional documents included a Social Security Disability Insurance ("SSDI") award letter (981), an independent medical exam ("IME") conducted by Dr. Joseph M. Dooley for the Social Security Administration ("SSA") (990), and a declaration provided by Anderson (998).

The award letter found Anderson disabled under the SSA's rules as of March 25, 2013.  (981.)   Dr. Dooley, a neurologist, conducted his IME of Anderson on April 1, 2014. (990.)   Anderson chiefly complained of "spinal stenosis, degenerative neurological condition, numbness of the face and throat, memory issues, concentration issues, possibly multiple system atrophy, blood pressure, breathing issues."  (990.)   Anderson explained to Dr. Dooley her history of trying to determine the cause of her ailments.  (991.)   She explained that her condition had become progressively worse, and since at least January 2014 she required the assistance of a walker or wheelchair.  (991.)   While physically

examining Anderson, Dr. Dooley observed a "slight tremor," reduced "pin sensation . . . over the entire body," "gait is broad-based, extremely unsteady, [and] she would fall if not supported." (992.) He noted her main impairments as "her inability to stand and walk and ataxia and problems using her upper extremities despite normal strength." (992.) His final impressions concluded that "she has some element of peripheral neuropathy. She has cerebellar degeneration and some signs of cognitive problems and some problems with speech and I think it's likely that she has neurological degenerative disease and muscle system atrophy is likely." (993.)

Anderson's May 25, 2014 declaration states that her disability cannot be excluded from coverage as a pre-existing condition since she did not encounter any of her symptoms "during the period from March 1, 2012 through May 31, 2012." (999.) The declaration also generally describes the onset of her symptoms in early 2013. (999.)

On June 6, 2014, LINA acknowledged receipt of Anderson's May 28, 2014 appeal including the medical records covering the pre-existing condition period and the additional attached documents. (244.) Yet, on July 28, 2014, LINA explained that while the medical records Anderson provided cleared Dr. Gause from the pre-existing condition period, they failed to do so for Dr. Hessler and Dr. Lykins. (242.) LINA therefore needed a note from both doctors "stating treatment or no treatment" of Anderson during the relevant timeframe. (242.) On October 19, 2014, Anderson's counsel supplied a certification from Dr. Hessler and Dr. Lykins that neither doctor treated Anderson over the course of the pre-existing condition timeframe. (911–14.)

In early November 2014, Dr. Richard Vatt, board certified in aerospace medicine and occupational medicine, reviewed Anderson's LTD claim on LINA's behalf to reach a disability conclusion. (448–56.) Dr. Vatt understood Anderson's occupation to be an account manager, which involved sedentary work demands. (448.) In a document dated November 6, 2014, Dr. Vatt outlined Anderson's medical records in detail starting with her first hospital visit on November 3, 2012 for pyelonephritis up through Dr. Dooley's IME report entered on April 1, 2014. (449–56.) Dr. Vatt concluded that "the medical

records reviewed do not document the presence of significant functional limitations that are continuous 03/26/2013 through 06/24/2013." (448.) Dr. Vatt also highlighted Anderson's irregular symptoms as expressed in the opinions of her physicians with regard to her complaints of weakness, gait, cognitive impairment, cardiac issues, and neuropathy. (448–49.) Indeed, Dr. Vatt explained that Anderson experienced "migratory symptoms for which evaluations have no identified physical pathology as an etiology[,]" and that her "physical exams [were] variable." (449.) In light of Dr. Vatt's conclusions, on November 7, 2014, LINA denied Anderson's LTD claim citing her variable symptoms and the lack of a clear physical pathology to explain her migratory complaints.[2] (238–40.)

On March 10, 2015, Anderson filed her complaint. (Doc. 1.) LINA filed a sealed administrative record on August 21, 2015. (Doc. 26.) Both parties filed briefs in September 2015 seeking *de novo* review of the administrative record and a ruling by the Court on Anderson's STD and LTD claims. (Docs. 27–30.)

## CONCLUSIONS OF LAW

### I.   Legal Standard

The presumptive standard of review of a fiduciary's decision to deny benefits is *de novo*. *Tuttle v. Varian Med. Sys. Inc.*, 15 F. Supp. 3d 944, 948 (D. Ariz. 2013) (*citing Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc)). Here, the parties agree that *de novo* review applies. (Docs. 27 at 11, 28 at 14.)

ERISA declares that an employee benefit plan "shall afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2). "Full and fair review" must "take[ ] into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without

---

[2] LINA seemed to treat the November 7, 2014 denial as its initial denial of Anderson's LTD claim, apparently considering its earlier March 20, 2014 denial based upon the pre-existing condition exclusion issue as something other than an appealable denial. (238–40.) While the parties disagreed over whether Anderson needed to appeal the November 7 decision, ultimately Anderson filed this lawsuit rendering the issue without

regard to whether such information was submitted or considered in the initial benefit determination."   29 C.F.R. § 2560.503–1(h)(2)(iv).   "However, because ERISA grants employers 'large leeway to design disability . . . plans as they see fit,' full and fair review does not require an administrator to credit evidence that cannot support a disability determination under the plain language of a plan."   P*eterson v. Fed. Express Corp. Long Term Disability Plan*, 2007 WL 1624644, at \*25 (D. Ariz. June 4, 2007) (*quoting Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833, (2003)).

*De novo* review "requires the district court to determine the presence of material facts in dispute, just as it does in other motions for summary judgment."   *Parra v. Life Ins. Co. of N. Am.*, 258 F. Supp. 2d 1058, 1064 (N.D. Cal. 2003) *aff'd sub nom. Parrra v. CIGNA Group Ins.*, 81 F. App'x 932 (9th Cir. 2003) (*citing Tremain v. Bell Industries*, 196 F.3d 970, 978 (9th Cir. 1999)).   Under *de novo* review, no deference is given to the administrator's decision to deny benefits.   *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1090 n.2 (9th Cir. 2010); s*ee also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).   "In a trial on the administrative record, the Court 'can evaluate the persuasiveness of conflicting testimony and decide which is more likely true.'"   *Gemmel v. Systemhouse, Inc.*, 2009 WL 3157263, at \*11 (D. Ariz. Sept. 28, 2009) (*quoting Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999)).   Nevertheless, the burden rests squarely on the plaintiff to prove that she was entitled to benefits under the STD and/or LTD Plans.   *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010); *Schwartz v. Metropolitan Life Ins. Co.*, 463 F. Supp. 2d 971, 982 (D. Ariz. 2006) ("Plaintiff has the burden of proof to show that he was eligible for continued long term disability benefits based on the terms and conditions of the ERISA plan.").

**II.   Analysis**

**A.   The Plan**

Both the STD and LTD claims require the same showing of disability:

"The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is: (1) Unable to perform the material duties of his or her Regular Occupation; and

(2) unable to earn 80% or more of his or her Indexed Earnings from working on his or her Regular Occupation."   (LINAASTD000011 (STD);  LINAAPOL000019 (LTD).) "Sickness" is defined as "[a]ny physical or mental illness."  (LINAASTD000026; LINAAPOL000036.)   "Regular Occupation" is defined as "[t]he occupation the Employee routinely performs at the time the Disability begins . . . [with] the duties of the occupation as [they are] normally performed in the general labor market in the national economy."  (LINAASTD000026; LINAAPOL000036.)  Anderson must provide "proof of earnings" or "satisfactory proof of Disability before benefits will paid." (LINAASTD000011, LINAASTD000015; LINAAPOL000019, LINAAPOL000024.)

The Plan explains that "[t]he Insurance Company will pay Disability Benefits if an Employee becomes Disabled while covered under this Policy."  (LINAASTD000015; LINAAPOL000024.)  Under both the STD and LTD claims, the Employee must satisfy the Elimination Period, defined as "the period of time an Employee must be continuously Disabled    before    Disability    Benefits    are    payable."    (LINAASTD000015; LINAAPOL000024.)  STD requires a 15-day elimination period, while LTD requires a 90-day elimination period.  (LINAASTD000011; LINAAPOL000019.)  Anderson must also be "under the Appropriate Care of a Physician," which means Anderson must "receive[] treatment, care and advice from a Physician who is qualified and experienced in the diagnosis and treatment of the conditions causing Disability . . . [c]ontinue[] to receive such treatment, care or advice as often as is required[,] . . . [and a]dhere[] to the treatment plan . . . ."  (LINAASTD000015, LINAASTD000025; LINAAPOL000024, LINAAPOL000034.)

If otherwise not found Disabled, an "Employee's coverage will end on . . . the date the    Employee    is    no    longer    in    Active    Service."    (LINAASTD000013; LINAAPOL000022.)   The Plan defines "Active Service" as essentially a regularly scheduled work-day where the "Employee is performing his or her regular occupation for the Employer on a full-time basis."  (LINAASTD000024; LINAAPOL000034.)  March 26, 2013 constituted Anderson's last day of Active Service.  (219.)

**B.     The Impact of *De Novo* Review and LINA's Previous Decisions**

Anderson dedicates a significant portion of her briefing to the various ways in which LINA erred in its denial of Anderson's STD and LTD claims.  Under *de novo* review, however, the Court reaches its own conclusions without any deference given to LINA's previous determinations.  *See Abatie*, 458 F.3d at 971–72.  Thus, Anderson's focus on the process by which LINA reached its conclusions, for the most part, does not affect the Court's review.  *See id.*  Nevertheless, Anderson raises one argument that goes to the completeness of the record, and other arguments that, while originally briefed as criticisms of LINA's disability determination process, are interpreted by the Court as a suggestion of the appropriate interpretive law that is applicable to its *de novo* review.

**1.     "Full and Fair Review"**

In assessing an appeal from a group health plan's adverse benefit determination "that is based in whole or in part on a medical judgment," the plan must "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment," 29 C.F.R. § 2560.503–1(h)(3)(iii), "who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual," 29 C.F.R. § 2560.503–1(h)(3)(v).

Anderson complains that LINA violated § 2560.503–1(h)(3)(iii) when it employed an Appeal Nurse Claim Manager ("ANCM"), and not a "qualified physician," to review Anderson's STD appeal.  (Doc. 28 at 6.)  When a claimant's claim is denied a "full and fair review" because of some procedural irregularity, "the court may [remand to] take additional evidence when the irregularities have prevented full development of the record" in order for the court to "recreate what the administrative record would have been had the procedure been correct."  *Hoffman v. Screen Actors Guild-Producers Pension Plan*, 571 F. App'x 588, 590 (9th Cir. 2014) (*quoting Abatie*, 458 F.3d at 973).  Anderson does not, however, argue, let alone show how, that LINA's use of an ANCM and not a doctor to review Anderson's STD appeal "prevented full development of the record."

1    Nor assuming that the record was incomplete due to LINA's failure to have it reviewed

2    by an adequate medical professional, does Anderson provide us with additional facts,

3    such as an additional medical evaluation of Anderson's medical records as they pertain to

4    the STD claim.  If a claimant asserts that the record is not complete due to a procedural

5    inadequacy, then the claimant can put forth additional facts which it asserts are necessary

6    to provide a full review of the record.  *Abatie*, 458 F.3d at 973 ("[I]f the administrator did

7    not provide a full and fair hearing, . . . the court must . . . permit the participant to present

8    additional evidence.")  Anderson has failed to do so here.  Consequently, the Court must

9    proceed to consider the appeal on the record provided.

10              **2.**      **Weighing the Opinions of Treating Physicians, Specialists, and**
11                             **Consulting Physicians**

12    Anderson contends that the Court should give greater weight to the opinions of

13    Anderson's treating physicians over the opinions of others.  Anderson, however, cites no

14    authority requiring a court, on *de novo* review, to accord special weight to the opinions of

15    a claimant's treating physicians.  Indeed, the law does not even place that burden on the

16    plan administrators themselves.  *See Black & Decker Disability Plan*, 538 U.S. at 834

17    ("[C]ourts have no warrant to require administrators automatically to accord special

18    weight to the opinions of a claimant's [treating] physician; nor may courts impose on plan

19    administrators a discrete burden of explanation when they credit reliable evidence that

20    conflicts with a treating physician's evaluation.")  Nevertheless, to the extent that it

21    makes more sense to give treating physicians more weight based on their familiarity with

22    the patient, the Court believes it makes sense to do so.

23    Anderson also argues that since Dr. Vatt does not practice neurology, his opinion

24    on Anderson's LTD claim lacks credibility.  Anderson relies on *Zavora v. Paul Revere*

25    *Life Ins. Co.*, 145 F.3d 1118 (9th Cir. 1998), which holds that an unspecialized plan

26    doctor's failure to confer with the claimant's specialist rendered his discretionary denial

27    of benefits an abuse of discretion.  *Id.* at 1123.  Unlike the doctor in *Zavora* who

28    summarily rejected the opinion of a specialist—the only opinion before him—before

denying the claimant's benefits, here Dr. Vatt reviewed Anderson's expansive medical history, which included the opinions of numerous physicians with various specialties. At any event, this Court relies on the evidence of all of the treating physicians whose opinions are summarized above more than it relies on Dr. Vatt's in reaching its decision. It, however, also considers Dr. Vatt's opinion.

### 3.   Anderson's SSA Award

The administrative record contains Anderson's SSA award letter and Dr. Dooley's report that supported the SSA award. The award letter, however, simply found Anderson disabled as of March 25, 2013 without any further substantive explanation as to why. Nonetheless, the Court accounts for Anderson's SSA award and Dr. Dooley's opinion in its review.

### C.   Medical Evidence

*De novo* review places the burden squarely on Anderson to prove that she is entitled to benefits under LINA's STD and/or LTD plans. *See Muniz*, 623 F.3d at 1294. Anderson must present evidence that proves her "Sickness" prevented her from "perform[ing] the material duties of . . . her" job as an account manager and "earn[ing] 80% or more of . . . her" wages. (LINAASTD000011; LINAAPOL000019.) For purposes of ERISA, the duties of an account manager are defined by that position in the general labor market in the national economy; thus, according to the Dictionary of Occupational Titles, an account manager is a sedentary occupation. (*See, e.g.*, 252.) Sedentary means: "Exerting up to 10 pounds of force occasionally or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are Sedentary if walking and standing are required only occasionally and all other Sedentary criteria are met." (252.) To prevail on her STD claim, Anderson must prove that she was continuously disabled from the day she left work on March 26, 2013, until the end of the 15-day elimination period on April 9, 2013. (LINAASTD000011.) Likewise, to prevail on her LTD claim,

Anderson must prove that she was continuously disabled from the day she left work on March 26, 2013, until the end of the 90-day elimination period on June 24, 2013. (LINAAPOL000019.)

Anderson's medical records demonstrate various migratory symptoms, yet, in her briefing, she generally defined her disabling condition as "a serious and progressive neurological condition . . . [that] impaired her cognitive functioning and also damaged her ability to control her motor functions." (Doc. 28 at 1.) Anderson also complained of severe back and neck pain, as well as "difficulty getting up and walking," bouts of numbness in her extremities, headaches, and hoarseness. (212.)

### 1.    Weighing the Medical Evidence of Anderson's Ailments

#### a.    Neurological Condition/Cognitive Function/Neuropathy/Numbness

Anderson complained chiefly of neurological and cognitive issues. Four neurologists, one neuropsychologist, and one psychologist examined Anderson: Dr. Laurin, Dr. Adcock, Dr. Kaufman, Dr. Dooley, Dr. Morrone-Strupinsky, and Dr. Locke. (811, 691, 466, 448, 534, 681.)

Dr. Laurin found the results of Anderson's neurological exam to be "completely normal" in her April 1, 2013 report. (871.) Dr. Adock's April 18, 2013 report expressed serious doubt about Anderson's alleged "serious chronic neurologic condition[,]" noting that her "exam and clinical history [were] not consistent" with Anderson's complaint. (691.) Dr. Adcock hoped to impress on Anderson that her neurologic exam produced "reassuring" results in order to "prov[e] to [Anderson that] her cognition [was] normal." (691–92.) As to Anderson's complaints of numbness, Dr. Adcock believed it "likely part of her overall clinical syndrome." (692.)

Dr. Kaufman examined Anderson at least four times between May and October 2013, and in his final report, he stated that Anderson's "neuropsychological assessment revealed slowed speed of information processing [and m]ild impairment of verbal learning and memory." (466.) Yet, Dr. Kaufman noted that the cause of her cognitive

1   issues remained unclear, and instead expressed that they were likely "multifactorial in
2   setting of chronic pain, depression, [and] sleep disturbance." (466.) Dr. Kaufman,
3   however, did express concern in an early September 2013 letter over LINA's denial of
4   Anderson's STD claim; although his concern stemmed from the denial being premature,
5   as opposed to substantively improper, since Anderson "continues to have ongoing
6   cognitive changes" and a "neurological workup is ongoing for these symptoms." (617.)

7       In April 2014, Anderson met with Dr. Dooley in connection with her separate
8   SSDI claim. (990.) Dr. Dooley observed Anderson's strength to be "5/5 in all four
9   extremities[,]" a "slight tremor" in her outstretched hands, a mild to moderate "heel to
10  shin tremor" with some loss of body control bilaterally, "deep tendon reflexes" in her
11  knees but not her ankles, and low sensitivity to pin pricks over her entire body. (992.)
12  Dr. Dooley also noted her gait to be "broad-based, extremely unsteady" to the point
13  where "she would fall if not supported" (992.) Despite her normal strength in her
14  extremities, Dr. Dooley expressed concern that Anderson still had "problems with her
15  upper extremities despite normal strength[,]" and noted her main difficulty as "her
16  inability to stand and walk." (992.) Dr. Dooley's clinical impression determined that
17  Anderson developed some form of "peripheral neuropathy[,] . . . cerebellar
18  degeneration[,] . . . cognitive problems[,] . . . problems with speech[,] . . . neurological
19  degenerative disease and muscle system atrophy . . . ." (993.)

20      In July 2013, Dr. Morrone-Strupinsky found Anderson to be of average
21  intelligence, but concluded that Anderson suffered borderline to mild impairment in
22  information processing, verbal learning, memory, and fine manual dexterity. (537–38.)
23  Dr. Morrone-Strupinsky, like Dr. Kaufman, held Anderson's cognitive issues to be
24  multifactorial in nature, and likely caused by other influences like pain, depression, or
25  sleep disturbance which "can reduce cognitive efficiency." (538.) Finally, Dr. Locke
26  conducted a neuropsychological assessment of Anderson, and determined that her
27  "cognitive profile [was] abnormal," primarily due to impairment in her executive
28  functioning and memory. (684.) Dr. Locke also scored Anderson below average on her

premorbid baseline, and tests covering language, attention/concentration, memory, and speed.  (683.)   In Dr. Locke's view, Anderson also showed risks of "somatoform disorder," although Anderson denied problems with anxiety or mood.  (683.)

Anderson's other physicians also observed and noted her various neurological, cognitive, and neuropathic symptoms and issues.  (755 (Dr. Durbin), 773 (Dr. Lykins), 695 (Dr. Vance), 519 (Dr. Campbell).)  Specifically, Dr. Campbell diagnosed Anderson with unspecified hereditary and idiopathic peripheral neuropathy.  (519, 517, 515, 513.) MRI and CT scans performed on Anderson's brain revealed no abnormal findings.  (782, 786.)

Finally, starting in late July 2013, Anderson began arriving at appointments in a wheelchair and with a walker.  (682.)  Yet, as Anderson explained to Dr. Dooley, it was not until January 2014 that her need for a walker and wheelchair became consistent. (991.)

Despite the diverse neurological, cognitive, and neuropathic findings recorded by the many doctors who examined Anderson, only Dr. Campbell, Anderson's family doctor, specifically directed that Anderson must not work due to her "unspecified hereditary and idiopathic peripheral neuropathy."  (515, 639, 615.)  None of Anderson's other doctors (neurologist or otherwise) definitively placed *any* functional restrictions on Anderson.   Indeed, Dr. Dooley, while concluding that Anderson likely suffered from some neurological and cognitive ailments, chose not to outline any specific limitations on Anderson.   (993.)   Furthermore, some doctors opted to prescribe everyday tips and remedies to overcome Anderson's cognitive hurdles as opposed to setting strict restrictions; for example, Dr. Morrone-Strupinsky recommended Anderson implement helpful routines like using a day-planner to overcome her lapses in memory.  (538.)

LINA physicians Dr. Taylor and Dr. Vatt also considered Anderson's varied history of neurological, cognitive, and neuropathic symptoms in their recommendations. Dr. Taylor accounted for Anderson's neurological reports, but ultimately concluded that the neurologists and their reports failed "to provide documentation of . . . cognitive

functional deficits by clinically measurable testing" that validate finding Anderson unable to work.  (183.)   In fact, Dr. Taylor highlighted that no treating physician ordered functional restrictions on Anderson as support for his finding of no disability.  (183.)  Likewise, Dr. Vatt reached the same conclusion; in fact, while directly addressing Dr. Campbell's prescribed restrictions, Dr. Vatt disagreed and opined that although Dr. Campbell presented a diagnosis of unspecified hereditary and idiopathic peripheral neuropathy, "[d]iagnostic testing has not revealed abnormal findings to support the diagnosis."  (449.)  Dr. Vatt found that Anderson's varied symptoms and inadequate clinical support undermined a finding of disability.  (448.)

Based on the varied conclusions and medical opinions in the record, there is sufficient evidence to support finding that Anderson suffered from negligible to mild neurological, cognitive, neuropathic, and/or numbness issues throughout the disability timeframe.

### b.      Back and Neck Pain

Anderson's other prominent complaint was back and neck pain.  Dr. Durbin first noted Anderson's complaints of back and neck pain in February 2013 (1055), Dr. Gause identified "degenerative disc disease" in March 2013 (755), Dr. Vance diagnosed Anderson with "intractable back pain with chronic pain syndrome" in April 2013 (694), Dr. Laurin accounted for degenerative disc disease in her April 2013 report (871), Dr. Kaufman noted back and neck pain as well as degenerative disc issues in his report in May 2013 (477, 479), Dr. Campbell listed degenerative disc disease, spinal stenosis, and fibromyalgia as some of Anderson's diagnosis in a July 2013 letter (615), and finally Dr. Dooley incorporated Anderson's history of back and neck pain in his report, although he made no specific observations on the subject (903).  CT scans of Anderson's spine also revealed "lower cervical degenerative disc space narrowing," "mild to moderate central canal narrowing," and "disc protrusions" in late February.  (722–23, 784, 787.)

Dr. Taylor included "neck and back pain" in his preliminary report on Anderson's STD claim, although he noted that Anderson scored a 5/5 in a strength test conducted on

her neck and extremities. (183.) Dr. Vatt analyzed the medical records of Anderson's many treating and examining physicians who recorded back and neck pain as part of Anderson's overall medical condition, but he did not list back and neck pain as one of Anderson's chief medical ailments. (448–54.) Although under the heading of "weakness," Dr. Vatt opined that "imaging of spine has shown abnormal findings but findings have not correlated to examinations." (448.) Finally, Anderson's own description of pain must be considered. *See Saffron v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 872 (9th Cir. 2008). In her declaration, Anderson testified that she felt severe back and neck pain leading up to her last day at HUB. (998–99.) Accounting for all of the evidence on the record, sufficient evidence supports a finding that Anderson suffered from some low degree of degenerative disc disease or spinal stenosis. Nevertheless, only Dr. Campbell expressed any need for restrictions due to Anderson's back and/or neck pain. (615.)

### c.   Headaches

Beginning in February 2013, Anderson complained of debilitating headaches to Dr. Durbin, Dr. Gause, Dr. Lykins, Dr. Adcock, Dr. Vance, Dr. Kaufman, and Dr. Campbell. (998, 1056, 753, 774, 691, 692, 479, 511.) Dr. Kaufman analyzed one of Anderson's MRIs, and concluded that certain anomalies in her brain were "consistent with migraine or small-vessel ischemic changes." (466.) Dr. Vatt also considered Anderson's complaints of headaches and migraines in his LTD determination. (448–54.) No physician contested the presence of Anderson's headaches, therefore the record supports finding that Anderson indeed suffered from moderate to severe headaches. That said, no physician prescribed any restrictions on Anderson due to her headaches.

### d.   Hoarseness

In March 2013, Anderson complained of hoarseness to Dr. Gause who recommended she see an ENT specialist. (755.) Dr. Lykins, an ENT specialist, found no physical or neurological source for Anderson's hoarseness, but opined that it may be a "sequela" of her other neurological issues. (774.) Dr. Vance also ordered Anderson to

undergo a speech evaluation to help diagnose her hoarseness, however, the results of the exam came back normal.  (724.)  Nonetheless, there is adequate evidence on the record that Anderson's voice went unexpectedly hoarse during the relevant disability period, although the cause remains unknown.

Dr. Lykins, the only physician to fill out a Medical Request Form from LINA used for purposes of determining Anderson's disability status, wrote "none" when asked if Anderson's hoarseness would cause her any work related restrictions.  (875.)  And no other physician commenting on her hoarseness recommended any other restrictions.

### 2.      Total Effect

The Court, after examining each condition in isolation, must also consider the aggregate effect of Anderson's issues.  *See Watson v. Metropolitan Life Ins. Co., Inc.*, 2012 WL 5464986, at *18 (D. Ariz. Nov. 8, 2012).  "The appropriate question [is] not simply whether any single condition [is] sufficient to warrant a finding of total disability, but also whether the combination of all of [claimant's] objectively demonstrated conditions indicated the presence of total disability under the Plan ."  *Peterson*, 2007 WL 1624644, at *26.  The specific question is whether Anderson's ailments rendered her continuously disabled from March 26, 2013 to either April 9, 2013 or June 24, 2013.

Between March and June 2013 Anderson began to experience various migratory symptoms.   Those symptoms included neurological issues, cognitive problems, neuropathy, back and neck pain, headaches, hoarseness, and numbness.  As explained previously, the evidence supports this finding.  The evidence, however, does not support finding Anderson disabled under the Plan.

As an initial matter, Dr. Campbell is the only physician on record to have expressly held that Anderson could not work due to her symptoms. (*See* 515, 639, 615.) The Court finds that Dr. Campbell's conclusions are not entitled to the weight of the other medical professionals who treated, examined, or reviewed Anderson and her medical records.  Dr. Campbell first examined Anderson on May 14, 2013.  (519.)  His notes from that visit list Anderson's complaints but fail to outline what diagnostic testing

Dr. Campbell performed or planned to perform to determine the cause of Anderson's issues.  (519.)  Nevertheless, two weeks later, on May 28, 2013, Dr. Campbell wrote a letter concluding that Anderson "suffers from multiple neurological symptoms . . . [that] have progressed to a disabling condition."  (639.)  Without providing any support for his findings beyond mentioning that Anderson spent time at the Mayo Clinic and was examined by an ENT specialist and a neurologist, Dr. Campbell declared Anderson disabled and unable to "perform her job functions, nor . . . perform a job of minimal or less demand."  (639.)  Having examined Anderson only once, Dr. Campbell's conclusion is unsupported by the his notes or Anderson's prior medical records.  Further, after just another four examinations, Dr. Campbell wrote a second letter on July 23, 2013 diagnosing Anderson with "chronic migraines, fibromyalgia, degenerative disc disease, spinal stenosis, and an unknown neurologic degenerative disorder . . . ."  (615.)  While Dr. Campbell states that "[t]hese symptoms and diagnoses can be confirmed in my notes and/or the notes of the neurologists and hospitals[,]" his notes and the notes of Anderson's other physicians fail to support such a decisive list of diagnoses and consequential limitations.  (616.)  The Court agrees with Dr. Vatt's views on Dr. Campbell's conclusions: he "does not provide documentation of physical examinations, diagnostic testing, or measuring of functional limitations to support his . . . opinion that [Anderson] is unable to work."  (449.)  Moreover, Dr. Campbell's credibility is also undermined by the fact that he noted "disability" as the reason for Anderson's June 24, 2013 appointment and wrote down similar reasons for Anderson's July 3, July 22, and August 27 examinations.  (*See* 515, 513, 511, 510.)

Anderson argues that the Court should consider Dr. Dooley's report the most credible given his position as neither one of Anderson's treating physicians nor one of LINA's consulting physicians.  *See Black & Decker Disability Plan*, 538 U.S. at 832 ("[I]f a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled,' so a treating physician, in a close case, may favor a finding of 'disabled.'").  That may be true; however, as noted above, Dr. Dooley's report does not set forth any

1   specific restrictions relating to Anderson.  The lack of such a recommendation diminishes

2   the medical record's usefulness.  Nonetheless, Anderson contends that although Dr.

3   Dooley chose not to include any limitations on Anderson after concluding that she likely

4   suffered from some neurologic or cognitive ailments, the report did lead to the SSA

5   finding Anderson disabled; thus, the practical effect is that the report at least implies the

6   need for functional limitations.  The Court, however, finds that the weight of Dr.

7   Dooley's report in this respect is still limited.  The burden to prove disability within the

8   SSA framework is markedly dissimilar to the burden at play in an ERISA case;

9   moreover, the SSA's disability award on record lacks any specific findings for the Court

10  to weigh.  Further, Dr. Dooley examined Anderson approximately one year after her last

11  day at HUB.  Despite Dr. Dooley analyzing Anderson's full medical history, his opinion

12  highlights symptoms that Anderson reported were objectively worse in 2014 than during

13  the disability timeframe, *e.g.*, Anderson's continual need for a wheelchair and/or walker.

14  (991.)  On its face, Dr. Dooley's report fails to articulate how the symptoms he observed

15  in 2014 also existed back in 2013 during the disability timeframe.  In fact, Anderson

16  asserts that her ailments were of a progressive nature; and the essence of a progressive

17  disorder contradicts Dr. Dooley's backwards extrapolation of Anderson's symptoms.

18  (Docs. 28 at 1, 30 at 13; 991; *but see* 1061 (Dr. Durbin, Anderson's original family

19  doctor, told Anderson on April 29, 2013 that "the present available evidence is not

20  consistent with a degenerative process . . . .").)  Thus, while Dr. Dooley's report may

21  imply the need for functional limitations, in the end, it does little to establish Anderson's

22  burden of proving her disability during the relevant 2013 timeframe.[3]

23      The record demonstrates that Anderson's symptoms, at their worst, caused her no

24  greater than mild impairment or slightly below average cognitive performance.[4]  In light

---

[3] Olga Reupert, as vice-president of benefits and compensation at HUB, is not qualified to opine on the propriety of Anderson's disability claim.  Moreover, her emails offer no first-hand observation of Anderson's condition, and are accordingly given little evidentiary value by this Court . (This conclusion does not apply to the letters from Dr. Campbell and Dr. Kaufman attached to the email.)

[4] To the extent Dr. Dooley's report discusses Anderson's trouble standing and

of that level of impairment, Anderson fails to carry her burden of establishing her inability to continue performing her duties as an account manager.   Moreover, by assigning little credibility to Dr. Campbell's conclusions and less weight to Dr. Dooley's, the record is devoid of any clear support for imposing any functional restrictions on Anderson.   Some doctors, in fact, suggested remedies (pain medication), tips (day-planner), or limited restrictions (no climbing) to overcome Anderson's impairments rather than recommending work prohibitions.   Couple all of that with variable and migratory nature of Anderson's symptoms on the whole, and there is insufficient evidence for the Court to conclude that Anderson was continuously "[u]nable to perform the material duties of his or her Regular Occupation; and (2) unable to earn 80% or more of his or her Indexed Earnings from working on his or her Regular Occupation." (LINAASTD000011; LINAAPOL000019.)   Although there may have been days where Anderson would have been unable to perform her duties, the record simply does not support finding Anderson *consistently* incapable of "[e]xerting up to 10 pounds of force occasionally or a negligible amount of force frequently . . . sitting most of the time, . . . [or] walking or standing for brief periods of time," *i.e.*, sedentary work, between March 26, 2013 and April 9, 2013 or June 24, 2013.

## CONCLUSION

For the foregoing reasons, the Court finds Anderson not disabled under either LINA's STD or LTD plans.

/ / /

/ / /

/ / /

/ / /

/ / /

walking, arguably an impairment more severe than a mild impairment, those troubles do not establish disability.   First, as evidenced by the record, remedial measures like wheelchairs and walkers can accommodate those deficiencies.   Second, Anderson told Dr. Dooley that those issues did not become consistent until January 2014, long after the relevant elimination period under the Plan.

**IT IS THEREFORE ORDERED** that Anderson's request for STD and LTD benefits is denied.  The Clerk of Court is directed to terminate this action and enter judgment accordingly.

Dated this 29th day of February, 2016.

Honorable G. Murray Snow
United States District Judge